**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC 20580<br><br>                    Plaintiff,<br><br>    v.<br><br>**EDGEWELL PERSONAL CARE COMPANY**<br>6 Research Drive,<br>Shelton, CT 06484<br><br><br>          And<br><br>**HARRY'S, INC.**<br>75 Varick Street,<br>New York, NY 10013<br><br>                Defendants. | Civil Action No. _____-cv-_____<br><br><br><br>**FILED UNDER SEAL** |

**COMPLAINT FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO**
**SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT**

For many years, Procter & Gamble ("P&G") and Edgewell Personal Care Company ("Edgewell") dominated the razor industry through their respective Gillette and Schick brands. P&G and Edgewell used their dominance to impose annual price increases. P&G and Edgewell benefited, and consumers suffered.

In 2016, Harry's, Inc. ("Harry's") ended P&G and Edgewell's dominance by expanding into brick-and-mortar retail at a significantly lower price point than P&G's and Edgewell's comparable products. Successful competition from Harry's—first in Target and later in

1

Walmart--prompted P&G and Edgewell to reduce price and develop previously unavailable value products, generating significant benefits for consumers.

Edgewell now seeks to acquire Harry's—"a disruptive force" as described by Edgewell—and eliminate Harry's as an independent competitor.  When asked about the acquisition on a November 2019 quarterly earnings call, Edgewell's CEO promised investors that if Edgewell is allowed to acquire Harry's, Edgewell will put an end to the "value destruction over the last couple of years" since Harry's expansion into brick-and-mortar retail.  Edgewell's CFO, on the same call, admitted that the "deal was never defined through the lens of cost synergies."

The elimination of Harry's will result in a substantial loss of competition that is likely to harm consumers through higher prices and reduced product choice.  The loss of competition takes two separate forms.  First, the Proposed Acquisition will eliminate the important and growing head-to-head competition between Harry's and Edgewell's branded and private label products.  This harm alone is sufficient to render the Proposed Acquisition unlawful.  Second, the Proposed Acquisition is likely to produce additional harm by permitting Edgewell and P&G to return to their accommodating behavior that facilitated yearly price increases.  The transaction should be temporarily restrained and preliminarily enjoined to permit the Commission time to adjudicate the legality of the transaction on its merits.

*     *     *

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining defendants Edgewell Personal Care Company ("Edgewell" or "Schick") and Harry's, Inc. ("Harry's"), including their agents, divisions, parents, subsidiaries,

2

affiliates, partnerships, or joint ventures, from consummating their proposed acquisition (the "Proposed Acquisition").  Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).  Absent such provisional relief, Edgewell and Harry's (together, "Defendants") would be free to consummate the Proposed Acquisition on February 4, 2020 at 11:59 p.m. EST.

Preliminary relief is necessary to maintain the status quo and prevent harm to competition while the Commission conducts an administrative proceeding on the merits.  The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on February 2, 2020.  Pursuant to FTC regulations, the administrative proceeding on the merits is scheduled to begin on June 30, 2020 and will provide a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. *See* 16 C.F.R. § 3.41 (2014).  This administrative proceeding will thoroughly evaluate the competitive effects of the Proposed Acquisition.

## NATURE OF THE CASE

1.      On May 9, 2019, after more than two years of discussion, Edgewell signed an agreement to purchase Harry's, a rival manufacturer and seller of razors.  Harry's successful 2016 leap from online, direct-to-consumer sales into brick-and-mortar retail stores interrupted over a decade of routine price increases by a once-stable duopoly.  This interruption has led to lower prices and new product offerings for razor consumers.  The Proposed Acquisition would neutralize "one of the most successful challenger brands ever built," eliminating head-to-head competition between Harry's and Edgewell, and removing the independent competitor that disrupted Edgewell and P&G's longstanding and stable duopoly.

3

2.      Historically, P&G's Gillette brand and Edgewell's Schick brand have dominated the system razors and disposable razors ("wet shave razors") industry.  Throughout the years of their shared dominance, Gillette led price increases and Edgewell followed.  ████████████ ██████████████████████████ to justify the price increases P&G and Edgewell rolled out new and fancier products.  Razor manufacturers enjoyed exceptionally high margins, while consumers suffered.

3.      As the 2010s progressed, P&G and Edgewell raised their prices ever higher. Purchasers of razors were, as Harry's founders put it, tired of "overpaying for overdesigned razors."  Harry's saw an opening: a market ripe for disruption and an untapped platform—the Internet—on which to disrupt.  Harry's founders correctly recognized that the market was looking for a no-frills, value-priced system razor product that delivered "a great shave at a fair price."  Seizing this opportunity, Harry's, like fellow start-up Dollar Shave Club, launched an Internet-based business to market and sell men's razors directly to consumers at a lower price point than the most comparable razors then available in brick-and-mortar retail stores.

4.      Harry's and Dollar Shave Club quickly succeeded in—and largely filled—the previously untapped online space.  But the successful entry by Harry's and Dollar Shave Club with their online Direct to Consumer ("DTC") models did not stop the price increases by P&G and Edgewell, both of which sold their products primarily through brick-and-mortar retailers.

5.      Significant change came when Harry's made the first—and, to date, only— successful jump from an online DTC platform into brick-and-mortar retail.  In August 2016, Harry's launched exclusively at Target with suggested retail prices several dollars below the most comparable Schick and Gillette products, a significant discount.  Harry's arrival in Target made a substantial impact, with Harry's immediately winning customers from Edgewell and

P&G.  Edgewell described Harry's trajectory as one of "phenomenal growth" and observed that

Harry's took "significant share."

6.      Harry's entry at Target ended the long-standing practice of reciprocal price

increases by Gillette and Edgewell.  Shortly after Harry's successful launch at Target, P&G

implemented a "once in a generation" ███ price reduction across its portfolio of razors, reversing

course on its practice of leading yearly price increases.  Edgewell changed course as well,

abandoning its strategy of being a "████████" of Gillette's pricing actions.  Rather than

match Gillette's ███ price decrease, Edgewell began tracking Harry's growth and increased

promotional spend (funding for discounts and other promotions) to combat Harry's entry.

Edgewell hoped that this effort would "get them on the beach," stopping Harry's before it made

further inroads into brick-and-mortar.

7.      But Harry's continued its competitive advance.  In May 2018, Harry's launched at

Walmart—again, successfully stealing shelf space and customers from Edgewell and Gillette.

8.      Harry's successful launch at Walmart, coupled with Harry's ongoing success at

Target, "forced [Edgewell's] hand."  Bowing to this competitive pressure, Edgewell

implemented its own significant list price decrease, lowering the prices on its razors by as much

as ███████.  Edgewell also fought back with a variety of other competitive initiatives ██████

██████, competing on price and non-price attributes, including creating "███████████" razors:

████████████████████████████████████████████████.

9.      Head-to-head competition between Harry's and Edgewell further intensified

when, in October 2018, Harry's launched its first women's razor under the Flamingo brand.

Edgewell preemptively reduced prices on its Hydro Silk women's razors and ran aggressive

promotions first in anticipation of, and later in response to, Flamingo's entry into Target.  Again,

Edgewell's efforts did not stop Harry's, although they may have slowed its momentum. Flamingo has taken significant market share from both Edgewell and Gillette at Target, and Target made room on its shelves for Flamingo at Edgewell's ██ expense.

10.    Harry's significant entry into brick-and-mortar retail transformed the wet shave razor market from a comfortable duopoly to a competitive battleground.  Edgewell, in particular, has found itself fighting the threat that Harry's poses to both its branded products and its private label offerings (*i.e.*, razors manufactured by Edgewell for a retailer partner, to be sold under the retailer's brand).  Consumers benefited from the resulting price discounts and the introduction of additional Edgewell branded and private label choices.

11.    The Proposed Acquisition is likely to result in significant harm by eliminating competition between important head-to-head competitors.  The Proposed Acquisition also will harm competition by removing a particularly disruptive competitor from the marketplace at a time when that competitor is currently expanding into additional retailers.

12.    The Proposed Acquisition would significantly increase concentration in relevant markets that are already highly concentrated today.  As a result, the Proposed Acquisition is presumptively anticompetitive.  Current market share statistics and concentration measures understate Harry's future competitive significance, however, because Harry's continues to expand into additional retailers with its men's and women's products.

13.    Both Edgewell and P&G have publicly recognized that the Proposed Acquisition is likely to benefit them rather than consumers.  Edgewell's CEO, who spent more than a decade at P&G before coming to Edgewell, recently explained on a quarterly earnings call that Edgewell is "not interested" in escalating price competition once the Proposed Acquisition is complete, or in "lead[ing] a new round . . . of value destruction"—that is, in lowering prices.  On a recent

quarterly earnings call, P&G's CEO explained that the Proposed Acquisition does not create a significant competitive threat to P&G's Gillette brand; to the contrary, "Edgewell's [sic] going to have to make money.  They bought a company. . . . And to me, that's not a bad thing for the overall value-creation opportunities in the industry."

14.     Defendants cannot show that the Proposed Acquisition will induce new entry that would be timely, likely, or sufficient to counteract the anticompetitive effects of the Proposed Acquisition.  Significant barriers exist for potential new entrants into the manufacture and sale of wet shave razors, including substantial capital investment in a manufacturing facility; significant intellectual property rights and trade secret protections; the time and difficulty of attracting a broad customer base to secure placement on retailer shelves; and the fact that the market gaps in wet shave in brick-and-mortar and online that Harry's successfully exploited have been largely filled.  These barriers make entry difficult and unlikely to constrain the merged entity.  Nor is the Proposed Acquisition likely to induce the remaining razor manufacturers to expand or reposition to offset the Proposed Acquisition's likely anticompetitive effects.

15.     Defendants cannot show cognizable, merger-specific efficiencies that would offset the likely and substantial competitive harm resulting from the Proposed Acquisition.

16.     On February 2, 2020, by a 5-0 vote, the Commission found reason to believe that the Proposed Acquisition would violate Section 7 of the Clayton Act and Section 5 of the FTC Act by substantially reducing competition.  The Commission issued its administrative complaint on that same day.

17.     Defendants have stipulated to the Court's entry of a temporary restraining order preventing Defendants from consummating the Proposed Acquisition until the fifth business day after the Court rules on the Commission's motion for a preliminary injunction or until after the

date set by the District Court, whichever is later.  Such a temporary restraining order is necessary

to preserve the status quo and to protect competition while the Court considers the Commission's

application for a preliminary injunction.

18.     Preliminary injunctive relief is similarly necessary to preserve the status quo and

to protect competition during the Commission's ongoing administrative proceeding.  Allowing

the Proposed Acquisition to proceed while the Commission is assessing whether the Proposed

Acquisition would harm competition and would undermine the Commission's ability to remedy

the anticompetitive effects of the Proposed Acquisition if it is found unlawful after a full

administrative trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

19.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under the

Acts of Congress protecting trade and commerce against restraints and monopolies, and is

brought by an agency of the United States authorized by an Act of Congress to bring this action.

20.     Section 13(b) of the FTC Act, 15 U.S.C. §53(b), provides in pertinent part:

Whenever the Commission has reason to believe –

> (1) that any person, partnership, or corporation is violating, or is about to
> violate, any provision of law enforced by the Federal Trade
> Commission, and

> (2) that the enjoining thereof pending the issuance of a complaint by the
> Commission and until such complaint is dismissed by the Commission
> or set aside by the court on review, or until the order of the
> Commission made thereon has become final, would be in the interest
> of the public – the Commission by any of its attorneys designated by it
> for such purpose may bring suit in a district of the United States to
> enjoin any such act or practice.  Upon a proper showing that weighing
> the equities and considering the Commission's likelihood of ultimate
> success, such action would be in the public interest, and after notice to

8

the defendant, a temporary restraining order or a preliminary
injunction may be granted without bond . . . .

21.     Defendants are, and at all relevant times have been, engaged in activities in or
affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of
the Clayton Act, 15 U.S.C. § 12.

22.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and
personal jurisdiction exists where service can be effected pursuant to a federal statute.  Fed R.
Civ. P. 4(k)(1)(C).  Defendants are therefore subject to personal jurisdiction in the District of
Columbia, and they have expressly consented to such personal jurisdiction in this case.  Venue is
proper in the District of Columbia under 15 U.S.C. §§ 22 and 53(b) and 28 U.S.C. § 1391(b) and
(c), as both Edgewell and Harry's transact business in the District of Columbia.

## THE PARTIES AND THE PROPOSED ACQUISITION

23.     Plaintiff the Federal Trade Commission is an administrative agency of the United
States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C.
§§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C.
20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*,
Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

24.     Edgewell is a consumer products company based in Chesterfield, Missouri, with a
diversified portfolio of over 25 established brand names, including multiple razor brands, such as
Schick, Intuition, Hydro Silk, Skintimate, Bulldog, American Safety Razor, and Jack Black.
Edgewell also offers private label razor manufacturing for retailers and razor companies selling
throughout North America, including ▮▮▮▮▮▮▮▮▮.  In 2018, Edgewell's total
branded razor sales were approximately ▮▮▮▮▮, broken down as follows: men's system
razors (▮▮▮▮▮), women's system razors (▮▮▮▮▮), and disposable razors (▮▮▮

9

██████ ).  Additionally, Edgewell's total sales in 2018 for its private label business were

approximately ████████ , broken down as follows: men's system razors (████████ ),

women's system razors (████████ ), and disposable razors (████████ ).

25.     Harry's, based in New York, New York, manufactures wet shave system razors

and sells them through its DTC platform, online retailers, and brick-and-mortar retailers under

the Harry's and Flamingo brands.  Harry's total branded razor sales in 2018 were approximately

████████ .  Harry's also manufactures private label system razors ████████ , and has annual

private label revenue of approximately ████████ .  In addition to wet shave razors, Harry's

sells a variety of other personal care items such as face wash, shave creams, and body wash.

26.     On May 9, 2019, Edgewell and Harry's signed an Agreement and Plan of Merger,

pursuant to which Edgewell would acquire Harry's.  Total consideration for the Proposed

Acquisition is approximately $1.37 billion in stock and cash.

27.     Pursuant to an agreement between Defendants and Commission staff, unless

temporarily restrained and preliminarily enjoined by this Court, Defendants would be free to

consummate the Proposed Acquisition after 11:59 p.m. on February 4, 2020.

28.     In authorizing the filing of this complaint, the Commission determined that (i) it

has reason to believe the Proposed Acquisition would violate the Clayton Act and the FTC Act

by substantially lessening competition in one or more lines of commerce, and (ii) an injunction

of the Proposed Acquisition pending the resolution of the Commission's administrative

proceedings and any appeals will promote the public interest, so as to minimize the potential

harm to customers and preserve the Commission's ability to order an adequate remedy if it

concludes, after the administrative proceeding, that the Proposed Acquisition is unlawful.

## RELEVANT MARKETS

29.     The relevant market in which to evaluate the effects of the Proposed Acquisition is no broader than the manufacture and sale of wet shave system razors and disposable razors ("wet shave razors") sold in the United States.

30.     It is also appropriate to analyze the effects of the Proposed Acquisition in narrower relevant markets within the wet shave razor market.  The razor industry recognizes several distinct segments within the wet shave razor market.  The relevant market may be divided by gender lines into markets of men's and women's products.  Additionally, the relevant market may be separated into markets for system razors and disposable razors.  Finally, the relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales.  Analyzing the Proposed Acquisition in these segments individually would focus attention on specific narrower markets where the harm is most acute— for example, a market for men's system razors sold in brick-and-mortar retailers.  Given consumer preferences for particular retailers or retail categories, relevant markets may even be defined as narrowly as a single retailer or a cluster of retailers in which competitive conditions are similar, such as brick-and-mortar retailers where Harry's is currently available.

### A.     Relevant Product Markets

31.     The relevant product market is no broader than the manufacture and sale of wet shave razors, which includes system razors and disposables.

32.     System razors consist of a reusable handle and a detachable razor cartridge. Consumers are able to replace the razor cartridge with refill cartridges sold by the same manufacturer without the need to replace the handle.

33.     Disposable razors comprise a single assembly of handle with permanently affixed blade(s).  Consumers throw away disposable razors once they are finished using them.

34.     Other forms of hair removal, such as electric (or "dry") shaving razors and alternative hair removal products (*e.g.*, hair removal creams or waxes) are not close substitutes for wet shave razors.  Industry participants and Defendants recognize that wet shave razors are distinct from dry shave razors and alternative hair removal products and sell these products at distinct price points to distinct consumers.

35.     Customers would not switch from wet shave razors to dry shave razors or alternative hair removal products in sufficient numbers to defeat a small but significant non-transitory increase in price ("SSNIP") by a hypothetical monopolist of wet shave razors.

36.     A relevant product market is the manufacture and sale of wet shave system razors and disposable razors.

37.     Industry participants also recognize narrower product markets divided along gender lines (men's versus women's), by product type (system or disposable), and by channel of sale (brick-and-mortar versus online).  Industry participants recognize each segment as distinct from others, and conduct their business accordingly.

38.     The Proposed Acquisition would produce anticompetitive effects within multiple narrower relevant markets, in addition to producing anticompetitive effects in the broader wet shave razor market.  The Proposed Acquisition would harm competition in narrower relevant markets for the sale of: (i) men's wet shave razors; (ii) women's wet shave razors; (iii) system razors (including both men's and women's); (iv) men's system razors; and (v) women's system razors.

39.     The Proposed Acquisition would also harm competition in relevant markets for sales through brick-and-mortar retailers of: (i) wet shave razors (including both men's and women's); (ii) men's wet shave razors; (iii) women's wet shave razors; (iv) system razors (including both men's and women's); (v) men's system razors; and (vi) women's system razors.

40.     In each of these narrower relevant markets, a hypothetical monopolist could profitably impose a SSNIP on purchasers of the relevant product.

**B.      Relevant Geographic Market**

41.     A relevant geographic market in which to analyze the Proposed Acquisition is the United States.  Razor manufacturers negotiate distinct terms of sale with customers for different countries and, in some cases, offer distinct product assortments in different countries. Defendants and other industry participants generally do not make granular or distinctive purchasing decisions for smaller regions within the United States.

42.     A hypothetical monopolist of wet shave razors in the United States profitably could impose a SSNIP on U.S. customers.  Customers based in the United States cannot defeat a price increase in the United States via arbitrage or substitution.

**MARKET PARTICIPANTS**

43.     Edgewell is the number two manufacturer of wet shave razors and by far the dominant supplier of private label razors in the United States.  It manufactures and sells wet shave system and disposable razors for men and women.  Edgewell's branded and private label products are available at many brick-and-mortar retailers and, in 2017, Edgewell launched a DTC website through which consumers may now purchase the Hydro Connect razor online directly from Edgewell.  Edgewell owns over 25 consumer brands, including popular wet shave

13

brands such as Schick, Intuition, Hydro Silk, Skintimate, Wilkinson Sword, Personna/American Safety Razor, Bulldog, and Jack Black.

44.     Harry's launched in March 2013 as an online-only DTC men's system razor subscription service.  Harry's does not manufacture or sell disposable razors.  Harry's broke into brick-and-mortar retail in 2016 and has steadily expanded its retail distribution of men's wet shave razors since then.  After launching exclusively in Target, Harry's expanded into Walmart in 2018 (███████████████████████████████); and then in Hy-Vee, Meijer, Wegmans, and Kroger in 2019.  In addition to its men's system razor, Harry's launched a women's system razor under the brand name Flamingo in October 2018.  Shortly thereafter, Flamingo launched exclusively at Target.  Flamingo is expected to reach additional retailers' shelves in the near future.  In addition to its branded men's and women's razors, Harry's also manufactures a private label system razor for ████████████████████████████ ████.  Harry's owns and operates its own razor factory, Feintechnik, in Eisfeld, Germany.

45.     P&G is the leading manufacturer and seller of branded system and disposable razors for men and women.  P&G's razors are available for purchase online and in brick-and-mortar stores.  P&G owns over 50 established brand names, including razor brands Gillette Venus, Gillette Fusion, Gillette Mach3, Gillette Skinguard, Joy, Bevel, and the Art of Shaving.

46.     Société BiC ("BiC") manufactures and sells primarily disposable razors for men and women.  BiC razors are available for purchase online and in brick-and-mortar stores.

47.     Dollar Shave Club, Inc. ("Dollar Shave Club"), now owned by Unilever plc/Unilever N.V. ("Unilever"), sells system razors marketed primarily to men using an online, DTC model.  Dollar Shave Club does not manufacture or sell disposable razors, and Dollar

Shave Club razors are generally not available in brick-and-mortar retail stores. ███████

███████████████████████████████████████████████████.

48.     Dorco Company Ltd. ("Dorco") is a manufacturer and supplier of disposable and

system razors for men and women. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████. Dorco-

manufactured products are available at brick-and-mortar stores and online, ███████████

████████████████████.

**THE PROPOSED ACQUISITION IS PRESUMPTIVELY ILLEGAL**

49.     The Proposed Acquisition would lead to significant increases in concentration in

already highly concentrated markets for wet shave razors and in narrower relevant markets.

50.     Under the 2010 U.S. Department of Justice and Federal Trade Commission

Horizontal Merger Guidelines ("Merger Guidelines"), a post-acquisition market concentration

level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an

increase in HHI of more than 200 points renders an acquisition presumptively unlawful.

Transactions in highly concentrated markets—markets with an HHI above 2,500 points—with an

HHI increase of more than 100 points potentially raise significant competitive concerns and

warrant scrutiny.  The HHI is calculated by totaling the squares of the market shares of every

firm in the relevant market pre- and post-acquisition.

51.     The market for the manufacture and sale of wet shave razors in the United States

is already highly concentrated, with an HHI of over 3,000.  The Proposed Acquisition increases

the concentration in this market by more than 200 points and is therefore presumptively illegal.

52.     All narrower relevant markets are also highly concentrated, and the Proposed

Acquisition would cause significant increases in concentration therein.  For example, the

manufacture and sale of wet shave system razors sold through brick-and-mortar retail in the

United States is already highly concentrated, with an HHI of over 5,000.  The Proposed

Acquisition increases the concentration in this highly concentrated market by more than 350

points, and is therefore presumptively illegal.  In the following narrower relevant markets, the

Proposed Acquisition increases the HHI by more than 200 points and results in a post-merger

HHI of more than 2,500, rendering the Proposed Acquisition presumptively illegal:

    a.   sale of wet shave razors at brick-and-mortar retailers;

    b.   sale of system razors;

    c.   sale of system razors at brick-and-mortar retailers;

    d.   sale of men's wet shave razors;

    e.   sale of men's wet shave razors at brick-and-mortar retailers;

    f.   sale of men's system razors;

    g.   sale of women's system razors;

    h.   sale of men's system razors at brick-and-mortar retailers;

    i.   sale of women's system razors at brick-and-mortar retailers; and

    j.   a cluster market composed of sales of wet shave razors at retailers where
       Harry's is currently available.

53.     In the following narrower relevant markets, the Proposed Acquisition increases

the HHI by more than 100 points and results in a post-merger HHI of more than 2,500, and

potentially raises significant competitive concerns and warrants scrutiny:

    a.   sale of women's wet shave razors; and

    b.   sale of women's wet shave razors at brick-and-mortar retailers.

54.    Changes in HHI based on current market shares understate the competitive significance of the Proposed Acquisition because Harry's continues to expand into additional brick-and-mortar retailers.  Recognizing that the Proposed Acquisition will arrest Harry's independent expansion, it is appropriate to analyze Harry's competitive significance by using prior entry events to project future competitive significance.  Moreover, current market shares especially understate the competitive significance of Harry's in markets that include sales of women's razors because Harry's Flamingo product launched very recently.

55.    ███████████████████████████████████████████████████████

██████████, the timing, scope, and competitive impact of that entry is speculative and likely would not counteract the Proposed Acquisition's competitive harm or presumptive illegality, especially when balanced against a fair projection of Harry's continued growth as a value razor product already established at retail.

## THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS

56.    In the relevant market of wet shave razors, and in each narrower relevant market within that market, the Proposed Acquisition is likely to result in unilateral and coordinated competitive effects.  The Proposed Acquisition would eliminate substantial head-to-head competition between Edgewell and Harry's, leading to higher prices for consumers—sufficient harm, on its own, to render the merger illegal.  In addition, the Proposed Acquisition would also make an already susceptible market more vulnerable to coordination by eliminating a disruptive competitor.

57.    P&G and Edgewell have dominated the wet shave razor market for decades,

██████████████████████████████████████████████████████████████

██████████████. This effective duopoly was good for manufacturers and bad for consumers: Edgewell secured gross margins as high as ████████ on its branded razors while Edgewell and Gillette focused their efforts on selling high-priced razors. Prices ratcheted up, ████████ ███████████████████████████████████████████.

58.     By the early 2010s, the wet shave razor market was ripe for disruption. Harry's founders recognized that P&G and Edgewell were failing to offer consumers a quality, no-frills system razor at a value price point. In March 2013, Harry's used the Internet to launch a men's system razor that filled this market gap by selling directly to the consumer, avoiding the initial need for distribution through brick-and-mortar retailers. As Harry's website explains: "Our founders, Jeff and Andy, created Harry's because they were tired of overpaying for overdesigned razors, and of standing around waiting for the person in the drugstore to unlock the cases so they could actually buy them. When they asked around, they learned lots of guys were upset about the situation too, so they decided to do something about it." Harry's was not alone in seeing this opportunity: Dollar Shave Club launched its online DTC platform in 2011.

59.     Harry's and Dollar Shave Club soon built an online customer base, but this did not stop Edgewell and P&G from continuing their annual price increases in brick-and-mortar retail stores. Edgewell's internal documents demonstrate that ██████████████████████ ███████████████████████████. As Edgewell's then-CEO explained in an earnings call, "the jury's out" on shave clubs because they would have to "become more than a shave club to really survive."

60.     Everything changed in August 2016, when Harry's expanded into brick-and-mortar retail. Harry's made Target the exclusive brick-and-mortar retailer for Harry's ████████ █████████████████████████████████████████. ████████

18

███████████████████████████ taking shelf space away from Edgewell's Schick brands, among others.

61.    Harry's entry into Target marked the beginning of meaningful head-to-head competition between Harry's and Edgewell.  One of Harry's general objectives was to displace Edgewell and to ████████████████████████████████ and, specifically, to ███████ ████████████████ at Target.

62.    Harry's launch at Target was successful.  At the time of its launch, Harry's ████████ retail prices were roughly $10 cheaper than P&G's Gillette and Edgewell's Schick five blade products.  This pricing advantage, coupled with prime product placement, enabled Harry's to take share quickly from Edgewell and P&G.

63.    Witnessing Harry's successful launch at Target, Edgewell immediately began tracking Harry's progress and started to respond competitively.  Edgewell's first competitive strategy was to launch extensive promotional programming, such as buy-one-get-one-free deals. Nonetheless, Edgewell lost share to Harry's.

64.    In February 2017, months after Harry's successful launch at Target, P&G refrained from implementing its yearly price increase.  Instead, P&G announced a significant █ price reduction across its portfolio of wet shave razor products.

65.    Edgewell decided not to follow the price cuts.  Instead, Edgewell held its list prices steady while launching new products and offering temporary promotional programs. Because of these efforts, █████████████████████████████ despite Gillette's reduced prices.  These efforts, however, did not prevent Edgewell from continuing to lose share to Harry's.

66.     By early 2018, it was clear to an Edgewell senior executive that the industry had experienced "a once in a generation industry reset," and it was "no longer true" that Edgewell could count on "████████████████████████████████."

67.     In May 2018, Harry's products appeared on Walmart's shelves.  Harry's ████ ████████████████████████████████████████████████ to secure distribution, and again took substantial shelf space and sales from Edgewell.

68.     As Edgewell's CEO explained to investors, Harry's launch at Walmart represented "the most significant impact" on Edgewell's wet shave business in fiscal year 2018.

69.     In the end, the competitive pressure generated by Harry's successful launches at Target and Walmart defeated Edgewell's plan to maintain list prices.  By the end of 2018, Edgewell had reduced its list prices significantly, by as much as ██████ on some razors.  At the time, Edgewell's then-CEO was preparing notes to explain the reason for the price cuts to his board.  He wrote: "Harry's in Target and then Harry's in Walmart forced our hand."

70.     Not only did the competitive pressure result in price cuts by Edgewell on existing products, it also forced Edgewell to innovate by developing quality razors at lower price points. Edgewell launched ██████████ razors—█████████████████████████████ ████████████—alone and in partnership with retailers.

71.     On the heels of its men's system razor's growing success, Harry's launched a women's system razor under the Flamingo brand in late 2018.  This time, Edgewell acted aggressively before Flamingo razors hit brick-and-mortar retail shelves, implementing preemptive price cuts on its women's system razors as part of the 2018 list price reduction. Edgewell also developed a ██████████████████████████████ in response to news of Flamingo's impending entry.  Despite Edgewell's efforts, Harry's gained at Edgewell's expense:

Flamingo established a significant competitive foothold, and took ███████ shelf space from Edgewell products.

72.     This head-to-head competition continues to the present day.  Harry's, with its men's and women's products at value price points, continues to be a fierce competitor.  Harry's recently expanded its brick-and-mortar footprint again, selling its products in Hy-Vee, Meijer, and Kroger.  And Harry's products are likely to expand into additional retailers in the near term regardless of whether Harry's is acquired by Edgewell.

73.     The Proposed Acquisition is anticompetitive because it will eliminate the growing competition between Harry's and Edgewell that has been highly beneficial to consumers.  As a result of that competition, consumers today enjoy lower prices on many different types of wet shave razors, and they have a broader selection of razors at value price points.

74.     Edgewell recognizes the many ways it can benefit at consumers' expense by acquiring Harry's.  As Edgewell's CFO put it, the "████████████████████████████████ ████████████████████████████████." Edgewell's Vice President ██████████████████ ████████████ has discussed how ████████████████████████████: the combined company could offer "███████████████████████████████████████" Or, Edgewell could simply "███████████████████████████████████████████ ██████████████████████████."

75.     In addition to the loss of important head-to-head competition between Harry's and Edgewell, the Proposed Acquisition would eliminate Harry's as a uniquely disruptive competitor that interrupted the P&G/Edgewell duopoly that Harry's founders and Edgewell's leaders variously called a "lazy monopoly," a "duopoly," and "oligopolistic."  Prior to Harry's entry into brick-and-mortar retail, each year Gillette raised ████ prices; and each year Edgewell would do the

same, devising justifications when cost changes did not support the increase.  Edgewell

maintained a "███████" strategy—█████████████████████████████████

█████████████, maintaining a consistent discount to the market leader.

76.    On one occasion in 2010, Edgewell employees ██████████████████

█████████████████████████████████████.  As a result,

Edgewell ██████████████.  Edgewell management was incensed: "████████████

██████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████."  █████████████████████████

████████████████████████████████████████████████

████████████████.  Moreover, Edgewell immediately ████████████

███████████████████████████████████████████

███████████████.  Executives subsequently noted that they had "████████████

████████████████████."

77.    Competitive conditions for the sale of wet shave razors and narrower relevant

markets display various features that make a market vulnerable to coordination as identified in

the Merger Guidelines.  For example, competitors can promptly and confidently observe the

competitive initiatives of their rivals.  And relatively few customers would switch to the

deviating firm before rivals are able to respond, limiting the incentives to deviate from the terms

of coordination.

78.    As the above demonstrates, the Proposed Acquisition likely would result in both

unilateral and coordinated competitive effects in the relevant market of wet shave razors.  The

anticompetitive effects alleged in paragraphs 56-77 are also illustrative of the type of harm likely to occur in each of the narrower relevant markets as a result of the Proposed Acquisition.

## LACK OF COUNTERVAILING FACTORS

79.     Defendants cannot show that the Proposed Acquisition will induce new entry or repositioning by existing razor manufacturers that would be timely, likely, or sufficient to counteract the anticompetitive effects of the Proposed Acquisition.

80.     In particular, existing competitors for the manufacture and sale of wet shave razors P&G/Gillette, Dollar Shave Club, and BiC are unlikely to reposition in a way that would deter or counteract the anticompetitive effects of the Proposed Acquisition.  P&G ███████ lead yearly price increases before Harry's disrupted the market rather than to compete vigorously on price.  ████████████████████████████████████████████████ .  ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ .

81.     The market for the manufacture and sale of wet shave razors, and narrower relevant markets within the wet shave category, have high barriers to entry that make timely, sufficient entry unlikely to occur.

82.     In order to be a significant competitor, a razor company must be able to manufacture and sell its own blades: in other words, the razor company must build or buy a factory.  Building a razor factory is expensive and can take years even with significant resources. Acquiring and running a factory may be even more costly, and few manufacturing facilities exist today.

83.     Even having secured a razor factory, an entrant must navigate a thicket of intellectual property rights and trade secret protections to gain the necessary know-how to deploy its manufacturing capacity and equipment effectively.  Among other things, it takes significant time, and significant investment, to develop a competitive razor blade.

84.     Once the razor manufacturer has a competitive razor blade, the manufacturer must secure distribution and premier product placement at brick-and-mortar retail in order to scale.  In order to secure brick-and-mortar distribution with premier shelf space, Harry's spent years establishing its brand online and then used a slow, staged rollout ███████████████████████ ████████████████████.  Replicating that process is likely to render entry or repositioning untimely, but failing to replicate that process decreases the likelihood of success.

85.     Any aspiring de novo entrant seeking to follow in Harry's footsteps faces a much steeper path to scale than the one that Harry's trod.  Harry's identified and exploited a market opportunity in the form of a previously unmet demand for a quality, no-frills system razor at a value price point.  Harry's was successful in developing its brand through the then-nascent online market, using the Internet to sell directly to consumers.  More importantly, Harry's was the first to place its product in brick-and-mortar, where it exploited a large gap in product offerings to reach a scale that allowed it to disrupt the industry giants.  Any new entrant would lack Harry's early-mover advantage in the now-mature DTC space and on the now-crowded shelves of brick-and-mortar retailers.  Because the size of the opportunity to be exploited is now smaller, entry is less profitable.  In effect, Harry's has plucked the low-hanging fruit online and in stores.

86.     Defendants cannot demonstrate cognizable and merger-specific efficiencies that would be sufficient to rebut the presumption and evidence of the Proposed Acquisition's likely anticompetitive effects.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

87.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the Proposed Acquisition until the Commission has had an opportunity to adjudicate the Proposed Acquisition's legality in an administrative proceeding.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.

88.     The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45.  In particular, the Commission is likely to succeed in demonstrating, among other things, that:

    a.  The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market no broader than the manufacture and sale of wet shave system razors and disposables;

    b.  Substantial and effective entry or expansion in these markets is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition; and

    c.  The efficiencies asserted by Defendants are insufficient as a matter of law to justify the Proposed Acquisition.

89.     Preliminary relief is warranted and necessary.  In the absence of preliminary relief, should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing vigorous competition between Edgewell and Harry's would be difficult, if not impossible, if the Proposed Acquisition has already occurred. Moreover, without relief from this Court, substantial harm to competition would likely occur in the interim, even if a suitable divestiture remedy were obtained later.

90.     Accordingly, the equitable relief requested here is in the public interest. Wherefore, Plaintiff respectfully requests that this Court:

   a.  Temporarily restrain Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a hearing on the Commission's application for a preliminary injunction under Section 13(b);

   b.  Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a full administrative hearing;

   c.  Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

   d.  Award such other and further relief as the Court may determine as appropriate, just, and proper.